**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

USDNY DOCUMENT ELECTRONICALLY FILED DOC #:_____ DATE FILED: 5/19/2026

PETER PIATETSKY,

       Plaintiff,

v.

PORT AUTHORITY OF NEW YORK and NEW
JERSEY AND POLICE OFFICER ANTHONY
CAMACHO,

       Defendants.

**Case No. 24-cv-9136 (CM)**

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMahon, J:

On December 2, 2023, Peter Piatetsky ("Piatetsky" or "Plaintiff") rode an electric

unicycle into the Holland Tunnel. Unregistered vehicles are not permitted in the Tunnel, and a

unicycle is an unregistered vehicle. Defendant P.O. Anthony Camacho, a member of the Port

Authority Police Department, tried to stop Piatetsky from entering the Tunnel, then stopped New

Jersey-bound traffic from entering the Tunnel in order to effectuate Plaintiff's arrest. Plaintiff

responded to the traffic stoppage by turning his unicycle around in the New Jersey-bound Tunnel

and riding it back toward Manhattan (*i.e.*, the wrong way) along the Tunnel's wall. When he

emerged from the Tunnel, he swerved his cycle away from where Camacho was standing. So the

officer tackled and arrested him. Piatetsky spent ten hours in a holding cell in the Port Authority

Bus Terminal before being transferred to Central Booking.

At his arraignment on the morning of December 3, 2023, Piatetsky pleaded guilty to one non-criminal count of disorderly conduct; he was sentenced to time served. All other charges against him (resisting arrest, attempted assault, trespass, and harassment), were dropped.

During the altercation with Camacho when he emerged from the Tunnel, Plaintiff claims that his ankle was injured, causing a temporary limp. He also alleges that he suffers from post-concussive neurological symptoms, such as persistent migraine headaches, photosensitivity, hyperacusis, insomnia and anxiety, as a result of hitting his head on a concrete barrier during the takedown. An initial CAT scan showed no neurological abnormalities, but one doctor has opined that Piatetsky suffered a traumatic brain injury as a result of the incident.

Piatetsky filed this lawsuit on November 27, 2024. He asserts claims under 42 U.S.C. § 1983 against Camacho for excessive force and denial of the right to a fair trial because of the purported fabrication of evidence. He also brought a *Monell* failure to train claim and a state law negligent hiring/training claim against the Port Authority. Piatetsky's claims under New York City Administrative Code § 8-802 have been dropped, as has his request for punitive damages.[1]

Following discovery, Defendants move for summary judgment dismissing all Piatetsky's claims, either on the merits or because Camacho is entitled to qualified immunity. For the reasons below, Defendants' motion is GRANTED in part and DENIED in part.

---

[1] Punitive damages are not a cause of action; they are a remedy.

2

## Statement of Facts

On a motion for summary judgment, the court considers all disputed facts in the light most favorable to the Plaintiff.

### I.  Holland Tunnel and the Port Authority Traffic Rules and Regulations

The Port Authority is a governmental agency created by compact between the states of New York and New Jersey. N.Y. Consol. Laws § 6401, et seq., N.J.S.A. 32:1–163. The Port Authority operates various water crossings, including the Lincoln Tunnel, George Washington Bridge, Bayonne Bridge, Goethals Bridge, Outerbridge Crossing, and the Holland Tunnel (the "Tunnel"). Nazareno Decl. Ex. H, at 2.

The events in this case occurred in and around one of the New York entrances to the Holland Tunnel en route to New Jersey. There are multiple entrances feeding into the westbound tunnel in the Soho/Tribeca area (it appears that there are as many as four), but once inside the tube itself, there are two lanes of traffic moving westbound toward New Jersey. At what I will call the North Freedom Place entrance to the New Jersey-bound Tunnel, a concrete barrier separates the right traffic lane from a drop-off into a gated maintenance area and ventilation shaft. Nazareno Decl. Ex. O at 00:00–00:05.

Vehicles driving from New Jersey back into New York are in a separate tube, so all cars entering the tunnel at issue in this case are headed to New Jersey.

The Holland Tunnel is governed by the Port Authority Traffic Rules and Regulations ("Traffic Rules and Regulations" or "Traffic Rules"). On the date in question, December 2, 2023, the rules in effect were those promulgated in a 2016 Revision. Those rules provide, in general, that, "Nothing contained or omitted [herein] shall be construed to relieve any person from

3

exercising all reasonable care to avoid or prevent injury or damage to persons or property." Dkt. No. 38-8, at 8.

Pursuant to the Traffic Rules that were in effect on the date of the incident, pedestrians, cyclists, and other non-motorized vehicles were prohibited from entering the Holland Tunnel, absent permission from the Port Authority. *Id.* at 10–11. The Traffic Rules then in effect also provided that, "No motor vehicle shall be permitted in or upon any part of a vehicular crossing which is not registered in accordance with the provisions of the law of the state in which such part of the vehicular crossing is located." *See* Nazareno Decl. Ex. H at 11. The tunnels are "vehicular crossings." And while the Traffic Rules do not define "Motor Vehicle," an electric scooter is a vehicle that has a motor. (Dkt. #1 ¶ 17) New York State did not then, and does not now, require riders to register electric scooters, including electric unicycles, before using them on New York streets. Dkt. No. 45 ¶ 21; *see* N.Y. Vehicle & Traffic Law §§ 114-e, 1282 (McKinney 2020) (Defining "electric scooter" and regulating their operation); N.Y. Dep't of Motor Vehicles, *Electric Scooters and Bicycles and other Unregistered Vehicles*, https://dmv.ny.gov/registration/electric-scooters-and-bicycles-and-other-unregistered-vehicles. Therefore, pursuant to the rule just discussed, electric unicycles were not permitted in the Holland Tunnel under the Traffic Rules in effect in 2016– although it was not until 2026 that the Rules were amended to include such vehicles on a comprehensive list all of the types of vehicles that fell within the restriction.[2]

---

[2] As of January 5, 2026, the Traffic Rules elaborate that "Vehicles or devices prohibited by the laws or regulations of New York or New Jersey from traveling on highways with characteristics similar to those of the Vehicular Crossing," and specifically prohibit "Pedestrians, Bicycles, other velocipedes, *Electric Bicycles, Light Scooters, Electric Scooters*, pushcarts, wheelbarrows, and all other non-motorized vehicles and Devices" from using Port Authority crossings. *See* Port Auth. N.Y. & N.J., *TB&T Traffic Rules and Regulations* (2026) (emphasis added). To the extent that some of these vehicles or devices are not required to be registered, they were always prohibited from entering the Tunnel, but the amended rule (not surprising, in light of the sudden profusion of such vehicles on the

4

At the time of the incident, there was signage posted outside the Tunnel to warn at least some of the drivers/riders who might be approaching that they and their vehicles are not permitted in the Tunnel. Those signs expressly prohibited "pedestrians" and "bicycles" from entering the Tunnel. Dkt. No. 37 ¶ 18. "Bicycle" is a defined term under the Traffic Rules: A "Bicycle [s]hall include a velocipede, tricycle or other light vehicle propelled by the riders or rider." *Id.* at 8. "Pedestrian" is defined as "a person afoot." *Id.* at 9. Although, as explained above, other types of unregistered vehicles were not allowed to enter the Tunnel, the signs at the entrance to the Tunnel did not specifically mention them.

Finally, drivers must pay a toll to enter New York, but are not required to pay a toll when leaving New York. Dkt. No. 38-8, at 8.

The Traffic Rules and Regulations are enforced by the Port Authority Police Department ("PAPD"). Dkt. No. 37 ¶ 16. PAPD officers assigned to the Holland Tunnel are responsible for overseeing traffic entering and exiting the crossing. *Id.*

## II.      The Events Underlying this Lawsuit

On the date of the incident, PAPD Officer Anthony Camacho ("Camacho" or "Defendant") was assigned to a foot post at the North Freedom Place entrance to the westbound tube of the Tunnel, where he had been working since his shift began at 6:00 AM. *Id.* ¶ 13. Officer Ivan Lee was also overseeing traffic on the New York side of the Tunnel. *See* Nazareno Decl. Ex. P. Officers Kyle Reitan, Rhett Peppi, and Vincent Sharkey were positioned at the Tunnel's exit in New Jersey. Dkt. No. 42, at 3; Nazareno Decl. Ex. Q at 16:00–16:20; Warner

---

streets of the city) clarifies any possible misunderstanding on that score. I cannot tell on the current record whether signage at the entrance to the Tunnel has been updated to conform to the Rule.

Decl. Ex. 8. Officer Kevin Corea was stationed nearby and arrived shortly after the collision. Nazareno Decl. Ex. P at 31:00–33:35. Dispatch Officer James Leister monitored the cameras in and around the Holland Tunnel. Dkt. No. 37 ¶ 9. Lieutenant Reynaldo Mendez was the supervising officer on duty who responded to the incident. Dkt. No. 37 ¶ 11.

PAPD officers, including Officer Camacho, receive training from the Port Authority. Dkt. No. 37 ¶¶ 19–20; Nazareno Decl. Ex. A, Camacho Tr. 36:21–25. Officers are trained to know the Traffic Rules and Regulations, Dkt. No. 37 ¶ 20, including what vehicles may and may not enter the Tunnel. Nazareno Decl. Ex. A, Camacho Tr. at 36:21–25. Officers also receive training on other police procedures, including the requirements for probable cause and the authorized use of reasonable force. Nazareno Decl. Ex. A, Camacho Tr. at 109:11–110:8, 115:4–16. While officers are taught that they may stop individuals if there is probable cause to believe that the driver has committed a crime or traffic infraction, the training does not include specific guidance about whether, when, and how force can be appropriately applied in order to stop someone on a moving vehicle. *Id.* at 113:14–125:6; Dkt. No. 42 at 5. Officer Camacho had previously been involved in a collision with a motorcycle that failed to stop for his commands following a traffic infraction. *Id.*, Camacho Tr. at 125:7–15.

One of the primary responsibilities of PAPD officers stationed at the Holland Tunnel is to monitor the roadway for vehicles prohibited from entering the Tunnel and to ensure that they do not enter. Dkt. No. 37 ¶ 16. PAPD officers are there to ensure that "only registered vehicles enter[] the Holland Tunnel." *Id.* At his deposition, Camacho explained, "There's multiple devices that are not allowed in the Holland Tunnel: bicycles, unicycles, unregistered mopeds. [. . .] [W]hen a vehicle or device is unregistered, it's not allowed to go into the [T]unnel, so you have to stop it from going in the [T]unnel." *Id.*, Camacho Tr. at 64:18–24. Prior to December 2, 2023,

6

Camacho had stopped "a fair number" of people riding electric scooters from entering the Tunnel, including people riding electric unicycles. Nazareno Decl. Ex. A, Camacho Tr. at 63:9–65:8, 125:7–15. Camacho testified that he learned about this rule from his experience as an officer, rather than from official training from the Port Authority. Nazareno Decl. Ex. A, Camacho Tr. at 26:6–27:15, 63:3–64:15.

On the afternoon of December 2, 2023, at around 2:10 PM, Peter Piatetsky rode his electric unicycle[3] into the Freeman Plaza North entrance to the New Jersey-bound Holland Tunnel. He was on his way to a friend's housewarming party in New Jersey. Nazareno Decl. Ex. Q at 17:45–18:40. He was wearing a wrap-around motorcycle helmet with a face shield and a visor, as well as wrist pads. Dkt. No. 37 ¶ 28.

It is undisputed that, as Piatetsky approached the Tunnel, Officer Camacho – who was wearing a black PAPD "baseball" style cap -- rushed toward Plaintiff from the left side of the roadway and tried to stop him from entering the Tunnel. Warner Decl. Ex. 1, Piatetsky Tr. 115:4–121:6. The parties offer differing accounts of exactly what occurred as Piatetsky approached the Tunnel. Camacho says he waved his hands, gestured for Plaintiff to stop and yelled, "Stop, police, stop!"); he also says that Piatetsky swerved to evade him and struck Camacho's left hand to push it to one side as he rode into the Tunnel. Piatetsky claims to have seen no such gestures and heard no such commands; he denies having touched the officer at any time, saying only that he looked back at the man in the baseball cap who had rushed toward him as he was driving into the Tunnel. But both men agree that (1) a man (Camacho) in a baseball cap (PAPD standard issue) ran toward Piatetsky (who was in the rightmost of the two traffic lanes) from the left as he

---

[3] An electric unicycle is a self-balancing, single-wheeled, personal transporter that is powered by an electric motor. Dkt. No. 1 ¶ 17.

approached the Tunnel's entrance; (2) the man in the baseball cap tried to interfere with Piatetsky in some way, by grabbing him or trying to push Plaintiff off his cycle; (3) Piatetsky was able to evade this interference and rode his unicycle into the Tunnel going toward New Jersey; and (4) as Plaintiff rode into the tunnel on his unicycle, he looked back at the person in the baseball cap. [4]

The parties call the court's attention to videos of the incident to reconcile their differences of opinion about exactly what occurred when Piatetsky rode into the tunnel. The videos are, frankly, inconclusive, at least about the things that are disputed. Unfortunately, Camacho's body-worn camera ("BWC"), which would have provided the best evidence about exactly what occurred, was turned off at the precise moment when Piatetsky approached and entered the Tunnel. Nazareno Decl. Ex. P at 00:00–00:30, 17:39–17:45. Two traffic cameras captured portions of the incident. *See* Warner Decl. Ex. 3; Nazareno Decl. Ex. O. The first, a fixed traffic camera with a bird's-eye view of the Tunnel entrance, records the initial interaction between Camacho and Piatetsky in its entirety, but the footage is low resolution and some parts of their interaction are partially obscured. Warner Decl. Ex. 3. The second, a remotely controlled camera positioned closer to the roadway, does not capture the beginning of their encounter; Piatetsky appears only after passing Camacho, and Camacho enters the frame only after Piatetsky has already entered the Tunnel. Nazareno Decl. Ex. O at 00:06–00:15.

The bird's-eye footage confirms that Camacho moved toward Piatetsky as Plaintiff merged into the rightmost westbound lane; the second camera confirms that Piatetsky looked back toward Camacho as he entered the Tunnel. Warner Decl. Ex. 3 at 00:13; Nazareno Decl. Ex.

---

[4] Given their differing perspectives and the fact that Piatesky was wearing a wrap around helmet it is easy to explain and reconcile the two accounts, but that exercise is neither necessary nor appropriate on this motion.

O at 00:00–00:10. Defendants concede that "video surveillance does not capture Officer

Camacho's use of verbal commands or arm gestures," Dkt. No. 45 ¶ 55; for this point they rely

entirely on Camacho's testimony. The videos are not clear enough, and do not cover enough of

the scene, for this viewer to be able to conclude one way or the other whether Piatetsky shook his

head or made any physical contact with the officer.[5] *See* Dkt. No. 37 ¶ 29; Dkt. No. 39, at 7; Dkt.

No. 42, at 12. In the end, the cameras confirm only the facts that are described above as

"undisputed." [6]

Once Piatetsky entered the Holland Tunnel, Dkt. No. 42, at 2; Dkt. No. 37 ¶ 25, Camacho

radioed the other officers and told them that a man on an electric unicycle had just entered the

Tunnel. Nazareno Decl. Ex. A., Camacho Tr. 57:10–16. Camacho and other PAPD officers

stationed on the New York side of the Tunnel stopped all traffic from entering the Holland

Tunnel and traveling westbound into New Jersey.  Dkt. No. 37 ¶ 35. Camacho positioned his

vehicle in the roadway and placed traffic cones across both lanes, which blocked anyone from

entering the Tunnel bound for New Jersey. Dkt. No. 37 ¶¶ 40–41; Nazareno Decl. Ex. O at 5:38–

7:30. Camacho stood between the cones, in front of the entrance to the Tunnel. Nazareno Decl.

Ex. O at 7:00–7:30. Cars began to queue behind Camacho's patrol car, waiting to enter the

---

[5] In their 56.1 statement, Defendants say that Camacho observed Piatetsky "swing his left hand back, making physical contact" with Camacho's left hand, citing Camacho's deposition transcript. Dkt. No. 37 ¶ 32. Plaintiff denied this and stated in his 56.1 counterstatement that he did not "swing his left hand back and [make] contact with Officer Camacho's left hand." Dkt. No. 43-1 ¶ 32. Defendants filed a reply to Plaintiff's 56.1 counterstatement, *see* Dkt. No. 45, wherein they respond to Plaintiff's denial by stating that the remotely controlled footage shows Piatetsky "swing his left hand, and then Camacho turn his head toward" the Tunnel. *Id.* ¶ 32. In fact, the footage shows Piatetsky with his left arm *in front of him* as he looked over his left shoulder, dropping it to his side one second later. Nazareno Decl. Ex. O at 00:05–00:06. Camacho is nowhere in frame when this occurs. *Id.* The remotely controlled footage does not show Piatetsky swing his arm backwards or smacking Camacho's hand.

[6] For purposes of the excessive force claim, any disputed facts are not material. For purposes of the right to a fair trial claim, the disputed facts are material and cannot be resolved on the present record.

Holland Tunnel.[7] Nazareno Decl. Ex. A, Camacho Tr. at 61:20–22. Piatetsky, meanwhile, was riding his unicycle toward New Jersey, on the yellow line that divided the two westbound lanes of traffic. Dkt. No. 43-1 ¶ 39.

Officer Lee, who was stationed by the New York entrance, managed traffic congestion just out of frame; he later explained that the closure caused significant traffic buildup at the entrance. Nazareno Decl. Ex. Q at 20:40–21:30. Inside the Tunnel, Officers Reitan and Peppi (the officers stationed at the New jersey end of the Tunnel) stopped traffic by driving towards Manhattan, parking their patrol vehicle across both lanes to face oncoming cars, and activating their emergency lights. Dkt. No. 37 ¶ 40. Obviously the officers' response to Piatetsky was creating a traffic logjam, which they were doubtless eager to clear as quickly as possible.

When traffic ceased moving inside the Tunnel, Piatetsky was stopped behind a box truck approximately twelve to fifteen cars away from the two officers. Nazareno Decl. Ex. C, Peppi Tr. at 22:10–11; Warner Decl. Ex. 1, Piatetsky Tr. 144:12–18. Someone radioed that Piatetsky was "about a camera and a half behind [Peppi]" and that he was "not moving." Warner Decl. Ex. 8 at 2:20–2:35. Peppi instructed officers to "keep it clear." *Id.* at 2:35–2:39. Reitan said, "Peppi, find out how far [he is], because I'll start running." Nazareno Decl. Ex. Q at 16:20–17:10.

Piatetsky was apparently unaware of all this police activity. Dkt. No. 37 ¶ 42. He did not see any police officers in the Tunnel, Warner Decl. Ex. 1, Piatetsky Tr. at 144:16–145:15, and it does not appear that the officers gestured toward Piatetsky or tried to get his attention. Nazareno Decl. Ex. C, Peppi Tr. at 23:21–22. Plaintiff saw flashing lights, but he certainly did not think those lights related to him or his behavior. He testified that he thought there might have been an

---

[7] These events are captured on the remotely controlled traffic camera. Nazareno Decl. Ex. O at 5:38–7:30.

accident, which he feared could delay traffic indefinitely. Warner Decl. Ex. 1, Piatetsky Tr. 149:14–150:4.

Piatetsky worried that he might be stuck in the Tunnel for a long time. He was concerned about the unicycle's battery life, as well as about the possibility that he would be inhaling exhaust fumes from stopped cars for an extended period. So he decided he would get himself out of the Tunnel. Since the way forward toward New Jersey was blocked, this meant turning his unicycle around and returning to Manhattan – going the wrong way (eastbound) in what was supposed to be a New Jersey-bound (westbound) lane. *Id.*, Piatetsky Tr. at 144:16–145:15, 146:10–22, 148:4–16; 154:15–25. Plaintiff rode along the wall back to the Manhattan entrance to the Tunnel; he placed himself adjacent to the wall in the lane on the right side of the road facing back toward Manhattan (not the lane he has used to enter the Tunnel). *Id.*, Piatetsky Tr. at 158:18–23. (I will call this the south lane, and the lane he had used to enter the Tunnel the north lane). Piatetsky seems to have been trying to ride on the "right (i.e., correct) side of the road," but both the north and the south lanes were one way westbound and he was going east -- so no matter which lane he was riding in (or adjacent to), he was going the wrong way on a one way "street."

When he learned that Piatetsky was heading back toward the entrance to the Tunnel, Camacho positioned himself along the shoulder of the roadway – a location from which he was not visible to individuals inside the Tunnel. Nazareno Decl. Ex. O at 7:30–8:00; Warner Decl. Ex. 4 at 8:55–9:05; Nazareno Decl. Ex. A, Camacho Tr. 79:7–80:20; Nazareno Decl. Ex. O at 7:30–9:30. And indeed, Piatetsky testified that he did not see Camacho as he approached the New York entrance going eastbound. Warner Decl. Ex. 1, Piatetsky Tr. 165:2–6.

11

The parties offer conflicting accounts of Camacho's conduct as Piatetsky emerged from the Tunnel, but once again the material facts are undisputed.

When he reached the entrance to the Tunnel (through which he proposed to exit the Tunnel), Piatetsky crossed from the south New Jersey lane into the north New Jersey bound lane – the lane he had used to enter the Tunnel. Warner Decl. Ex. 4, at 8:55–9:05. Although Piatetsky denied changing lanes at his deposition, the video, for once, is definitive; it shows him changing lanes, and so establishes this fact as undisputed. *See* Nazareno Decl. Ex. O at 9:00–9:05. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

When Piatetsky changed lanes, Camacho – thinking that Plaintiff was trying to evade arrest –decided to "run after [Plaintiff] and stop him."[8] *Id.* at 88.

Camacho ran toward Plaintiff and grabbed for Plaintiff to try to stop him and get him off the cycle.

The force of this contact drove Piatetsky off his unicycle and into the concrete barrier. Warner Decl. Ex. 4 at 8:55–9:05; Nazareno Decl. Ex. Q at 9:00–9:23.

Piatetsky's head and body struck the barrier, and he fell to the ground. Nazareno Decl. Ex. O at 9:00–9:14.

Plaintiff's unicycle hit the barrier and rebounded into the roadway, which caused Camacho to trip and fall to the ground with Piatetsky. *Id.* at 9:04–07.

Piatetsky regained his footing with the aid of the concrete barrier that separated the road from the gated maintenance area. *Id.* at 9:07–9:14.

---

[8] Whether Plaintiff was or was not trying to evade arrest is not a material fact; what Camacho thought was going on is, however, a material fact, as will be seen.

Camacho grabbed Piatetsky's leg, hoisted himself upright, and shoved Plaintiff back against the barrier before bringing him to the ground and cuffing him. *Id.* at 9:12–9:50; Nazareno Decl. Ex. P at 00:00–00:30.

Those facts are undisputed. A number of additional facts about their encounter are in dispute. For example, Camacho claims that he again issued multiple verbal and physical commands to stop as Piatetsky emerged from the Tunnel; however, as his BWC was off, anything Camacho might have said cannot be heard. Piatetsky denies hearing any commands, which of course does not mean that they did not happen; as noted above, Plaintiff was wearing a wraparound helmet, which could have impeded his hearing. Dkt. No. 37 ¶¶ 43–45.

Camacho also maintains that he was standing in the center of the left lane, directly in front of Plaintiff, when he called out to Plaintiff to stop.  Nazareno Decl. Ex. A, Camacho Tr. 87:20–88:19, 90:5–91:11. However, the traffic cameras do not show him in this position; Camacho attributed this to "an overshadow," and the fact that it is "dark once you enter that area." *Id.*, Camacho Tr. at 87:9–88:7.

Finally, Camacho claimed that Piatetsky failed to comply with his orders and tried to flee on foot before being placed in handcuffs. Dkt. No. 37 ¶ 49. In their motion for summary judgment, Defendants add that Piatetsky "[held] onto the concrete barrier with his hands in front of him to avoid being handcuffed with his hands behind his back." Dkt. No. 37 ¶ 49. Piatesky testified that he was holding the barrier, but only with one hand. Dkt. No. 43-1 ¶ 49. The officer testified that he grabbed Piatetsky's leg after seeing Plaintiff lift it as if to climb over the concrete barrier, Camacho Tr. 132:6–11. It is not possible to tell one way or the other whether that is true by looking at the video, but Piatesky denies trying to climb over the barrier. *Id.*; Nazareno Decl.

Ex. A, Finally, Camacho reported that Piatetsky "remained uncooperative and continuously attempted to flee the scene after interception." Nazareno Decl. Ex. I, at 5. Piatesky begs to differ.

I list these disputed facts because some of them were later incorporated into the police report, which was written by Officer Lee based on information he received from Camacho. *Id.* That report is relevant to Piatetsky's claim for denial of his right to a fair trial. Its contents are not material to the excessive force claim.

Camacho finally activated his body-worn camera as he placed Piatetsky in handcuffs; it began recording audio approximately thirty seconds later. Nazareno Decl. Ex. P at 00:00–00:30. In the video, Piatetsky asked whether he was under arrest, and Camacho responded, "Dude, yes, now you are." He told Piatetsky that he was not allowed to take an electric unicycle into the Tunnel. *Id.* at 00:30–01:00.

Camacho can be heard saying to Piatetsky "You listen to me the first time I told you not to go." *Id.* Piatetsky responded that he did not know Camacho and was confused by the implication that the two had previously spoken or that any warning had been given, saying, "Excuse me. Sir, I don't know you." Camacho responded, "What do you mean you don't know me? I'm a police officer," to which Piatetsky replied, "You're saying this like you've talked to me before." *Id.* Once Piatetsky was placed in handcuffs, Camacho said, "You know you pushed my hand away." *Id.* at 2:20–2:30. Piatetsky denied making contact with Camacho, stating, "Sir, I did not touch you." *Id.* at 2:20–2:30.

Officer Lee arrived shortly thereafter to help escort Piatetsky to the patrol car. *Id.* at 1:40–2:20. Once at the car, Camacho and Lee – joined by Officers Peppi, Reitan, Sharkey, and Corea – searched Piatetsky and his belongings. Nazareno Decl. Ex. P at 3:10–4:10. During the search,

14

Camacho again insisted that Piatetsky had failed to comply with commands, stating, "You were not stopping or listening to my directions. I told you to stop the first time," and asserting that, if Plaintiff had been cooperative, he "would have stopped the first time." Nazareno Decl. Ex. P at 5:00–5:10, 5:44–6:02. Piatetsky responded that he did not know Camacho was a police officer, had not heard or seen any commands, and had not touched Camacho's hand. *Id.* at 5:44–6:02; Nazareno Decl. Ex. Q at 3:47–4:05.

Body-worn camera videos show Piatetsky as officers removed his helmet, searched his person, and inspected his bag. *See* Nazareno Decl. Ex. Q at 00:00–00:45, 2:07–6:58. In those videos, Piatetsky complied with directions given by the officers, Nazareno Decl. Ex. P at 00:00–00:45, 9:30–9:37, and repeatedly denied having struck Camacho. *Id.* at 00:30–00:58, 2:20–2:30, 5:44–5:55, 5:56–6:02; Nazareno Decl. Ex. Q at 3:47–4:05, 18:29–31, 33:34–33:45.

After the search, officers placed Piatetsky in the patrol car, where he remained in handcuffs. Nazareno Decl. Ex. P at 9:30–9:37. The officers then conferred about what had happened. Camacho said that he had signaled for Piatetsky to stop, that Piatetsky shook his head "no," and that he struck Camacho's hand as he rode past the officer. Nazareno Decl. Ex. P at 10:14–11:31. Lee asked, "So, are you hurt?" Reitan responded that Camacho had scrapes on his hand, but Camacho attributed those to the arrest, not the hand strike. *Id.*

Camacho told officers that he "had to grab him and kind of like push him to get off" the unicycle when Plaintiff emerged from the Tunnel. *Id.* at 11:10–11:16. Reitan replied, "You gave him a warning, he ignored the warning." *Id.* at 11:30–11:33; Nazareno Decl. Ex. Q at 9:35–9:38. During this exchange, Camacho said nothing about Piatetsky's lifting his leg, trying to climb over the barrier, or otherwise attempting to flee via the maintenance area.

15

When Camacho said he wanted to explain to the Lieutenant what had happened, Lee asked, "What are you doing?" Nazareno Decl. Ex. P at 10:10–10:15. As Camacho began to recount what happened again, Officer Sharkey points to his BWC. Nazareno Decl. Ex. P at 15:39.

Lieutenant Mendez arrived shortly thereafter and spoke to Camacho about the incident. Nazareno Decl. Ex. P at 17:30–18:20; Nazareno Decl. Ex. Q at 15:00–15:10. Camacho muted his BWC while he told the Lieutenant what transpired. Nazareno Decl. Ex. P at 17:52–19:40.

The officers discussed what charges they might file against Piatetsky. Reitan suggested criminal trespass, and Lee stated that they were "going with trespass for now," and that Piatetsky would likely receive a desk ticket, noting that the ultimate decision would be made by Lieutenant Mendez. Nazareno Decl. Ex. Q at 11:00–12:36. Lee contacted dispatch to run Piatetsky's information and confirmed that he had no outstanding warrants. *Id.* at 11:00–12:54.

Lee approached the patrol car and told Piatetsky that electric unicycles were not permitted in the Tunnel, and that the supervising lieutenant would likely speak with him. *Id.* Lee also stated that the officer at the Tunnel entrance had directed Piatetsky to stop but added that Piatetsky "probably didn't understand it" and that "you probably didn't hear because you had the helmet [on]." *Id.* at 17:57–18:01.

Piatetsky responded that he had neither seen nor heard an officer and that, as he exited the Tunnel, "all [he] saw was somebody rushing toward [him] trying to push [him]." *Id.* at 17:45–17:50. He reiterated that he "was not aware that there was an officer behind [him]" when he entered the Tunnel. *Id.* at 18:29–18:31. Lee acknowledged these statements, telling Piatetsky that it was "an honest mistake" and "it's not the end of the world." *Id.*

16

Lieutenant Mendez spoke with the other officers regarding the incident. Nazareno Decl. Ex. Q at 18:56–19:30. Mendez asked whether Piatetsky had reported any injuries and whether any were visible. *Id.* None of the officers had asked Piatetsky if he sustained any injuries, and Reitan responded that Piatetsky had not mentioned any. *Id.*

Lee remarked that it "sounds like [Piatetsky] didn't know" that he could not ride his electric unicycle into the Tunnel. *Id.* Mendez responded, "That's not what Camacho is saying." *Id.* at 19:30–19:33. Mendez said that Camacho had told him that he told Piatetsky to stop, that Piatetsky shook his head "no," and that Piatetsky "smacked his hand away" when Camacho tried to stop him. *Id.* Mendez added, "That's not the same as not knowing." *Id.*

Mendez also asked officers whether Piatetsky had been compliant when officers arrived at the scene. *Id.* at 20:30–20:37. Reitan confirmed that Piatetsky was not resisting when he arrived, although "he was already in cuffs already." *Id.*

Camacho asked for medical assistance for his hand shortly after the arrest, and emergency medical personnel were dispatched. Nazareno Decl. Ex. P at 7:55–8:02. In the interim, Camacho continued to move about the scene, driving his patrol vehicle and using his hand. *Id.* at 11:50; Nazareno Decl. Ex. Q at 13:02–13:31. When asked about his condition, Camacho stated that his hand was "just hurting a little bit" and declined an offered ice pack, indicating that he would wait for the ambulance. Nazareno Decl. Ex. Q at 13:02–13:31; Nazareno Decl. Ex. P 14:21–15:10. Emergency medical personnel arrived shortly thereafter and treated scratches on Camacho's hand. Nazareno Decl. Ex. P at 17:33.

During his interaction with paramedics, Camacho described the incident and stated that Piatetsky had "hit [his] hand out of the way" when he attempted to stop him, and that he was

injured when he grabbed Piatetsky and fell to the ground. *Id.* at 19:50–20:22. Camacho indicated that he wanted to go to the hospital. *Id.* at 19:50–20:22. EMS offered to let Camacho ride in the front seat of the ambulance, rather than in the patient compartment, when he was ready to leave. *Id.* at 27:40–27:48.

Camacho said that he and another officer would likely receive overtime if he went to the hospital. Nazareno Decl. Ex. P at 27:20–27:40; 13:34–14:43. Reitan responded that it would "definitely" require overtime, noting that he was already over that threshold. *Id.* Officer Corea said he was on overtime too but wanted to know who would accompany Camacho to the hospital. Nazareno Decl. Ex. Q at 27:15–32:00. Lee answered that Lieutenant Mendez had not picked anyone yet, and Corea quipped that the Lieutenant would decide by asking "which guy needs a collar?" *Id.* at 24:30–24:58. At that point, Lee covered his camera and tells the officer "I'm still live," meaning that his BWC is still recording. *Id.*

As predicted, when the time came to bring Piatetsky to the bus terminal for booking, Lieutenant Mendez asked officers about their current assignments and hours, including whether they were already extended or "maxed out." Nazareno Decl. Ex. Q at 27:00–27:40. Reitan confirmed that he was already maxed out, while Sharkey indicated he was also working extended hours. *Id.* Mendez directed that Reitan remain at the Tunnel while Corea would accompany Camacho to the hospital. *Id.* at 32:55–33:05. He told Sharkey and Lee to book Piatetsky at the bus terminal. *Id.* As Sharkey and Lee prepared to leave the scene, Lee asked whether they would receive overtime. *Id.* at 41:00–41:10.

Camacho returned to the ambulance to coordinate his transport with EMS and discuss when he would be ready to leave. Nazareno Decl. Ex. P at 27:20–27:40. During that interaction, Camacho indicated that Piatetsky would be charged, not only with trespass, but also with

"attempted assault," based on Camacho's insistence that Piatetsky had struck his hand. *Id.* at 27:40–27:48. A paramedic responded, "Nice." *Id.* at 28:05. A moment later, the paramedic asked whether Camacho's BWC was on; Camacho confirmed that it was. *Id.*

Lieutenant Mendez briefly spoke with Piatetsky before he was transported from the scene. Nazareno Decl. Ex. Q at 33:34–33:45. Piatetsky apologized for entering the Tunnel. He said that he had not known electric unicycles were prohibited and told Lieutenant Mendez that he had not been given a stop signal or verbal warning. *Id.* Mendez responded, "I think we're a little bit beyond that now, but I appreciate the sentiment;" he also pointed out that there were signs posted at the Tunnel entrance. *Id.*[9] Piatetsky continued to explain that he had not received any warning; Mendez did not engage further with his account. *Id.*

Officers Lee and Sharkey transported Piatetsky from the scene to the Port Authority Bus Terminal. Nazareno Decl. Ex. Q at 43:29–1:06:00. During the ride, Piatetsky asked what would happen to him and whether he needed a lawyer. *Id.* at 44:30–45:30, 52:40–54:00. Lee responded that criminal trespass was "not that serious" and stated that Piatetsky would likely receive a Desk Appearance Ticket (or "DAT"), which meant that, in all likelihood, Piatetsky would be able to go home without seeing a prosecutor. *Id.* Lee told Sharkey that he believed Piatetsky would only receive a DAT, although he did not yet know what the Lieutenant wanted to charge. *Id.* at 48:30–49:45. Lee said four times during the drive that he needed to consult with Lieutenant Mendez to learn what charges would be filed. *Id.* at 45:30–46:00, 48:30–48:55, 49:30–49:45, 1:05:45–1:05:54.

---

[9] These are the signs that warn against entry by pedestrians and bicycles. As noted above, it has taken some time for the signage to catch up to the many novel types of vehicles being ridden around New York City these days. The rules, however, plainly barred Plaintiff's unicycle from entering the Tunnel. Like all drivers/riders, Plaintiff was supposed to know the relevant traffic rules.

Upon arrival at the Bus Terminal, Piatetsky first reported that his foot and ankle hurt; he appeared to be limping. *Id.* at 1:06:05–1:06:55. Sharkey and Lee brought him inside for processing while he remained handcuffed. *Id.* at 1:06:00–1:07:00. Once inside, officers conducted an additional search of his person and belongings, including his pockets, jacket, and bag. *Id.* at 1:07:00–1:08:30. Piatetsky was then placed in a holding cell. Nazareno Decl. Ex. Q at 1:08:30–1:09:00.

While in the holding cell at the bus terminal, Piatetsky asked officers for Tylenol for a headache. Dkt. No. 42 at 5. The officers told him that he would be released more quickly if he refused medical attention. *Id.* He remained in the holding cell until approximately 12:45 AM on December 3, at which point he was transferred to central booking by Reitan and Sharkey. Nazareno Decl. Ex. R.

During the transport, Reitan assisted Piatetsky, who was walking with a limp and complained of a hand injury. *Id.* at 00:00–00:15, 18:30–40. Piatetsky arrived at central booking after 1:20 AM. *Id.* at 38:00–44:30.

Officer Lee was Piatetsky's designated arresting officer. Dkt. No. 37 ¶ 56. Camacho spoke with Lee during and after the arrest to assist Lee with the arrest paperwork. *Id.* ¶ 53, 56. Camacho told Lee that Piatetsky had assaulted him while entering the Tunnel and resisted arrest by struggling against him and attempting to flee "continuously" after being arrested. *Id.*; Nazareno Decl. Ex. I. Based on what Camacho had told Lee and the Lieutenant, Lee charged Piatetsky with (1) Assault in the Second Degree, P.L. § 120.05(3); (2) Reckless Endangerment in the Second Degree, P.L. § 120.20; (3) Obstructing Governmental Administration in the Second Degree, P.L. § 195.05; (4) Trespass, P.L. § 140.05; (5) Reckless Driving, Vehicle & Traffic Law § 1212; (6) Obedience to Police Officers and Flagpersons, Vehicle & Traffic Law § 1102; and

20

(7) Resisting Arrest, P.L. § 205.30. Nazareno Decl. Ex. J. Lee forwarded the paperwork to the New York County District Attorney's office. Warner Decl. Ex. 2, Camacho Tr. at 128:6–19, Nazareno Decl. Ex. K.

The top charge, assault in the second degree, is a class D violent felony. P.L. § 120.05(3). When an officer makes a lawful warrantless arrest, unless the top charge is a qualifying felony or satisfies an enumerated exception, the officer must issue a Desk Appearance Ticket. *See* Crim. Proc. Law § 150.20(1)(a), (b). However, if the offense is a class A, B, C, or D felony, a defendant is generally transported to Central Booking. That is what happened to Piatetsky; he was not issued a DAT but was instead taken to One Police Plaza. *Id.*; Nazareno Decl. Ex. R; Dkt. No. 42, at 12.

The New York District Attorney's Office charged Piatetsky with (1) Resisting Arrest, P.L. § 205.30, (2) Attempted Assault in the Third Degree, P.L. § 110/120.00, (3) Criminal Trespass, P.L. § 140.05, and (4) Harassment in the Second Degree, P.L. § 240.26(1). Dkt. No. 37 ¶ 60; Nazareno Decl. Ex. F.

On December 3, 2023, Piatetsky was arraigned on the criminal complaint in New York County Criminal Court. At his arraignment, Plaintiff pled guilty to disorderly conduct, P.L. § 240.20, a non-criminal violation. All other charges were dropped. Nazareno Decl. Ex. M. Piatetsky was released from police custody after the arraignment. Warner Decl. Ex. 1, Piatetsky Tr. at 85:2–21.

### III.    Plaintiff's Alleged Injuries

Piatetsky first sought medical treatment on December 4, 2023, the day after he was released from custody. *Id.*, Piatetsky Tr. at 198:6–201:14. He reported that he vomited multiple

21

times after arriving home on December 3 and was struggling to sleep. *Id.*, Piatetsky Tr. at 191:25–192:13. He complained of pains in his head, wrist, and leg from the incident. *Id.*, Piatetsky Tr. at 198:6–201:14. He was treated for his wrist injury and placed in a foot brace. *Id.*, Piatetsky Tr. at 205:312–18. He had a CT scan and neurological assessment at Lenox Hill Hospital. *Id.*, Piatetsky Tr. at 205:3–206:9. The initial imaging did not reveal any abnormalities, however, Piatetsky was later evaluated by Dr. Kristen Dams-O'Connor, Director of the Brain Injury Research Center of Mount Sinai Hospital, who concluded that Piatetsky had suffered a traumatic brain injury as a result of the incident. Warner Decl. Ex. 6.

Piatetsky avers that he continued to suffer from migraine headaches, fatigue, and increased anxiety in the days following the incident, and even to today. *Id.*, Piatetsky Tr. at 209:3–19; Warner Decl. Ex. 9. He reports that his coping skills are not as strong as they once were, and that since the incident, he finds it harder to manage his stress and regulate his emotions. Warner Decl. Ex. 6, at 6. His heightened anxiety manifests as racing thoughts, persistent worry, sleep disturbance, and hypervigilance. *Id.* Piatetsky also complains of stomach issues, sensitivity to light and noise, and difficulty concentrating. Warner Decl. Ex. 1, Piatetsky Tr. at 217:13–218:8. Dr. Dams-O'Connor stated that these symptoms are common following a traumatic brain injury. Warner Decl. Ex. 6, at 6. To alleviate his symptoms, he consults a therapist, wears noise-cancelling earmuffs, works in low light, and wears an ice cap on his head. Dkt. No. 42, at 7; Warner Decl. Ex 6, at 5–6.

## Discussion

Summary judgment is appropriate only if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute exists where "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Issues such as "credibility assessments, choices between conflicting versions of events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003).

The Court must "resolve all ambiguities and draw all permissible inferences in favor" of the nonmovant. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003). The Court views the record as a whole when determining a movant's entitlement to summary judgment, but "it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Zellner v. Summerlin*, 494 F.3d 344, 370 (2d Cir. 2007).

We will first consider Piatetsky's claims against Officer Camacho and then proceed to discuss his claims against the Port Authority.

## I.    Excessive Force: The First Cause of Action is Dismissed On Qualified Immunity Grounds

*A.  There is No Basis to Dismiss the First Cause of Action on the Merits*

Plaintiff's first cause of action asserts a claim for excessive force under 42 U.S.C. § 1983. Officer Camacho, the Defendant on that claim, argues that this Court should dismiss Piatetsky's excessive force claim as a matter of law because Piatetsky's injuries were *de minimis*. Dkt. No. 39 at 5. He argues that if injuries are *de minimis* injuries there is *ipso facto* no constitutional violation. *Id.* Camacho does not make any other argument about why the Court should dismiss Piatetsky's excessive force claim on the merits.

Piatetsky argues that his injuries were not *de minimis* and that, even if they were, his excessive force claim would nevertheless be permitted under the Fourth Amendment as per the Second Circuit's holding in *Ketcham v. City of Mount Vernon*. 992 F.3d 144, 150 (2d Cir. 2021).

23

Dkt. No. 42, at 9. He argues that a reasonable jury could conclude that Camacho's use of force was excessive whether his injuries were *de minimis* or not.

The Court agrees with Piatetsky.

Claims that police officers used excessive force during an arrest are "analyzed under the Fourth Amendment and its reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Examining the reasonableness of the force used "requires careful attention to the facts and circumstances of each particular case," *id.* at 396, including "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148–49 (2d Cir. 2021); *see Graham*, 490 U.S. 386.

An "officer may not intrude on a person's Fourth Amendment rights by employing a degree of force beyond that which is warranted by the objective circumstances of an arrest." *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019). "[T]here are some circumstances in which no use of force – even *de minimis* force – is reasonable because no force at all is required." *Kistner v. City of Buffalo*, No. 21-CV-526, 2023 WL 144915, at *10 (W.D.N.Y. Jan 10, 2023) (citing *Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir. 1999); *Aghoghoubia v. Noel*, 2020 WL 2489727, at *6-7 (E.D.N.Y. May 13, 2020); *Weather v. City of Mount Vernon*, No. 17-CV-1927, 2011 WL 1046165, at *9 (S.D.N.Y. Mar. 22, 2011), *aff'd*, 474 Fed. App'x 821 (2d Cir. 2012); *Sash v. United States*, 674 F. Supp. 2d 531, 539-40 (S.D.N.Y. 2009)).

"Consistent with the 'fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder

24

could conclude that the officers' conduct was objectively unreasonable.'" *Kirton v. Doe*, No. 20-CV-10860 (KMK), 2025 WL 2696510, at *5 (S.D.N.Y. Sept. 22, 2025) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

The only merits-based argument made by Camacho is that the force he used could not have been excessive because any injuries suffered by Piatetsky were *de minimis*. But there is no "*de minimis* injury" exception to the excessive force doctrine. "[The Second Circuit has] never held that a court may grant summary judgment to officers on an excessive force claim merely because the injuries were minor even where the force was unreasonable." *Ketcham v. City of Mount Vernon*, 992 F.3d 114, 150 (2d Cir. 2021); *see also Sash v. United States*, 674 F.Supp.2d 531, 539–40 (S.D.N.Y. 2009). As my colleague The Hon. Kimba Wood held long ago in *Ortiz v. Pearson*, 88 F. Supp. 2d 151, 160 (S.D.N.Y. 2000), a plaintiff's injuries "need not be serious in order to give rise to a constitutional claim." In order to defeat an excessive force claim, "It is the force used, not the injuries caused, which must be determined to be *de minimis* as a matter of law." *Harding v. Gould*, 2024 WL 3742688, at *6 (S.D.N.Y. Aug. 9, 2024) (internal quotations and citations omitted). Were it otherwise, such a rule "would grant a windfall to officers who commit misconduct but could escape liability based upon the hardiness of their victims." *Ketcham*, 992 F.3d at 151.

Camacho has not argued that he used force that was *de minimis* as a matter of law; he only argues that Piatetsky's injuries were *de minimis*. Therefore, he is not entitled to summary judgment dismissing the excessive force claim on the merits. Whether the amount of force used was limited to that which was necessary to get Piatetsky to stop and get off his cycle, or was more than was necessary to accomplish that result, presents a question for the jury to resolve –

25

which is, no doubt, why Camacho did not make the argument he needed to make in order to prevail.

Furthermore, Camacho's argument is predicated on an erroneous interpretation of the record. Piatetsky offered evidence that he suffered more than *de minimis* injury as a result of being pushed off his unicycle into the wall. BWC footage shows Piatetsky walking with a limp and complaining of pain in his wrist – injuries for which he was treated shortly after being released from custody. Nazareno Decl. Ex. Q at 1:06:05–1:06:55; Nazareno Decl. Ex. R at 00:00–00:15, 18:30–40; Warner Decl. Ex. 1, Piatetsky Tr. at 198:6–201:14, 205:312–18. Despite wearing a helmet, Piatetsky reported pain in his head after the incident. While in the Bus Terminal holding cell, Piatetsky informed officers he had a headache and requested Tylenol. Dkt. No. 42, at 5. He reports that he has been experiencing migraine headaches since the incident. Warner Decl. Ex. 6, at 5. Although his initial CAT scan revealed no abnormalities, one physician has opined that he suffers from traumatic brain injury and post-concussive symptoms. *Id.* He claims to have trouble sleeping, stomach pains, and increased anxiety, which have inhibited his productivity and affected his coping skills. *Id.* at 6.

The extent of these injuries "is certainly a matter that the jury can consider in assessing both the reasonableness of the force and potential damages from any misconduct, [but] a district court should not grant summary judgment on this basis alone." *Ketcham*, 992 F.3d at 151.

### B. *The First Cause of Action Fails Because of Qualified Immunity*

So the question becomes whether Officer Camacho is entitled to qualified immunity as a matter of law on Plaintiff's excessive force claim. The answer is, yes, he is.

The defense of qualified immunity protects government officials from suit "if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). To determine whether an officer is entitled to qualified immunity, the Court considers (1) "whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right," and (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Careless lawyering by Defendants' counsel nearly forfeited this argument. In their moving brief, Defendants argue qualified immunity with reference to the standard for false arrest. But no false arrest claim was asserted in this lawsuit, and there was unquestionably probable cause to arrest Piatetsky. However, once Plaintiff's counsel pointed out his opponent's obvious error, PAPD counsel shifted course and argued in the reply brief that Camacho's use of force to effectuate the arrest of Piatetsky was not actionable on qualified immunity grounds. While courts ordinarily do not consider arguments that are first raised in reply, *see United States v. Hill*, 462 F. App'x 125, 127 n.2 (2d Cir. 2012), I am inclined to overlook counsel's error,[10] and I will consider the question of qualified immunity as it should have been raised originally – that is, whether Camacho is entitled to qualified immunity on Plaintiff's Fourth Amendment claim of excessive force. Plaintiff will not be prejudiced by my decision to consider the issue because his lawyers, having noted the error, went on to brief the issue using the correct standard in his brief in opposition. *See* Dkt. No. 42 at 15–18. I am grateful to them for doing so.

---

[10] I doubt this was a "ChatGPT" error, but rather was a "cut and paste from an old brief" error. Either way, arguing false arrest when the issue is excessive force was a careless thing for PAPD counsel to do.

The question to be answered is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (citation omitted). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017) (quoting *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 7 (2021)). Under this prong, the Court considers "clearly established law and the information the officer[] possessed, accounting for any reasonable mistakes of fact." *Matusak v. Daminski*, 165 F.4th 702, 712 (2d Cir. 2026). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotations and citation omitted).

There is no question that an individual's Fourth Amendment right to be free from the application of excessive force was "clearly established" as a general principle at the time of the incident. *See Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995). But because the use of excessive force is an area of the law "in which the result depends very much on the facts of each case," officers are generally entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue. *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015)).

The parties do not point to – and the Court is not aware of – any "precedent squarely govern[ing] the specific facts at issue." *Mullenix*, 577 U.S. at 15, and it will come as not surprise to learn that the court has not found such a case, either. In their briefs, the parties focus on the frequency with which the police encounter and try to stop unregistered vehicles trying to enter the Tunnel (or some other public highway on which they are not supposed to be). But in this case, the allegedly excessive force was not applied when the Plaintiff entered the Tunnel. From a

28

Fourth Amendment perspective, the issue is whether officers frequently encounter people who have illegally entered a tunnel (which means they have already committed a traffic infraction) and who are then coming back out of said tunnel in an equally illegal manner – going in the wrong direction -- and in a manner that, to the police officers, could reasonably appear to be an effort to evade capture (whether that be true or not). The fact that neither the parties nor the Court has found a single case with facts remotely similar to the facts at bar alone suggests that qualified immunity attaches to Camacho's conduct.

But let us assume *arguendo* that there is a case out there whose facts "clearly establish" that Plaintiff had the right to be free from the application of excessive force in the precise circumstances confronting Camacho. Camacho is nonetheless entitled to qualified immunity because, on the undisputed material facts – viewed most favorably to Piatetsky – it was objectively reasonable for the officer to believe that grabbing for the Plaintiff and pushing him off his unicycle (the allegedly excessive force) – even if that resulted in Plaintiff's being pushed into a concrete barrier -- did not violate that right. *See P.C. v. McLaughlin*, 913 F.2d 1033, 1039 (2d Cir. 1990) ("Even when a plaintiff's federal rights are clearly defined, qualified or good faith immunity might still be available if it was objectively reasonable for [the public official] to believe that his acts did not violate those rights") (internal quotations and citation omitted).

It is undisputed that Camacho observed Plaintiff riding an unregistered electric unicycle on the approach toward the Holland Tunnel.

It is undisputed that Camacho walked toward the point where the lanes merged to enter into the Tunnel and that he did something (exactly what id disputed) that caused Plaintiff to conclude that a total stranger (whom he did not understand to be a police officer) was trying to interfere with his forward progress into the Tunnel.

29

It is undisputed that Piatetsky nonetheless rode his unicycle into the Tunnel, which (because the unicycle was a unregistered vehicle) was a violation of the PAPD Traffic Rules and Regulations, and that he looked back at Camacho as he did so, indicating that he was aware of the officer's presence (even though he did not know Camacho was a police officer).

It is undisputed that Camacho and his colleagues tried to stop Plaintiff while he was in the Tunnel, by stopping westbound traffic and preventing other vehicles from entering the Tunnel.

It is undisputed that Plaintiff made it approximately halfway through the tunnel until he had to stop as a result of the police activity ahead of him.

It is undisputed that Plaintiff, finding himself unable to proceed, turned around and headed back east toward New York City, going the wrong way on a westbound lane in the New Jersey-bound Tunnel tube.

It is undisputed that Officer Peppi sent a radio transmission that Plaintiff was riding his electric unicycle back toward the New York entrance to the Tunnel.

It is undisputed that Camacho was positioned at the mouth of the Tunnel entrance when Piatetsky reached the entrance to (which for him was going to be the exit from) the Tunnel.

And it is undisputed – because the video establishes it beyond peradventure – that as Plaintiff rode back out of the Tunnel past Camacho, he changed lanes and swerved away from where the officer was standing (whether Plaintiff could see Camacho or not is of no moment).

On those undisputed facts, no reasonable factfinder could conclude that Camacho's decision to grab for Plaintiff in order to stop him – which pushed Plaintiff off his unicycle and caused him to fall into the concrete barrier – was objectively unreasonable.

Camacho was confronted by someone whom he knew to be illegally trespassing in the Tunnel – someone he had not been able to prevent from entering the Tunnel in the first place. He knew that the rider was coming back out of the Tunnel in the wrong direction on a one-way road, and was thereby evading the traffic stop that had been effectuated inside the Tunnel. The fact that Piatetsky did not understand that *he* was the reason traffic was stopped is irrelevant; to a reasonable police officer, someone riding a unicycle the wrong way out of the Holland Tunnel, after illegally entering the Tunnel in the first place, could well look like a person who was trying to evade the police.

Moreover, the video shows that Piatetsky did in fact change lanes when he emerged from the Tunnel, Nazareno Decl. Ex. O at 9:00–9:05, which meant he swerved away from the officer. To a reasonable police officer, the lane change would only reinforce the idea that the rider was trying to get away from the police. Such an officer would have every incentive to do whatever was necessary to stop the rider from getting away. And it is hard for this Court to conceive of any way of stopping a man who was riding on an electric unicycle, other than grabbing for him – even if that pushed Plaintiff off his cycle and into the barrier, causing him to hit his head on the concrete.

On these undisputed facts, at least some reasonable police officers in Camacho's position "could have believed that [Camacho's conduct] was within the bounds of appropriate police responses." *Saucier*, 533 U.S. at 208.

The many issues of fact that Piatetsky raises to try to defeat summary judgment are simply not material to the qualified immunity analysis. For our purposes, it does not matter whether Camacho did or did not stand in the middle of the traffic lanes and signal the Plaintiff not to go into the Tunnel in the first place. It does not matter whether he shouted commands at Piatetsky, either as he entered into or exited from the Tunnel, or whether Piatetsky heard those commands. It does not matter whether Piatetsky knew or did not know that Camacho was a police officer. It does not matter whether Piatetsky understood that he was being warned and chose to ignore those warnings. It does not matter why Camacho decided to stop traffic. It does not matter whether Piatetsky was trying to climb over the concrete barrier after he fell from his unicycle. All of those facts may be disputed, but none of them is material to the issue of whether Camacho is entitled to qualified immunity for using force to get Piatetsky off his unicycle and place him under arrest. The only facts that are material to that issue are facts that are undisputed. *See McKinney v. City of Middletown*, 49 F.4th 730, 740-41 (2d Cir. 2022). No one has to credit Camacho's version of the matters in dispute in order to conclude that a reasonable police officer in Camacho's position could readily have concluded that force was needed to get the Plaintiff off his unicycle and under arrest.

Because I cannot conclude that only an officer who is "plainly incompetent" or who "knowingly violate[s] the law" would have acted as Camacho did when Piatetsky emerged from the Holland Tunnel, I am constrained to conclude that Camacho is entitled to qualified immunity on Plaintiff's excessive force claim. *Mullenix*, 577 U.S. at 15. Therefore, Camacho's motion for summary judgment dismissing Plaintiff's First Cause of Action is granted.

## II.    Denial of a Right to Fair Trial

Camacho also moves for summary judgment on Piatetsky's claim that Camacho denied him the right to a fair trial by fabricating evidence – namely, by falsely claiming that Plaintiff struck Defendant's hand and resisted arrest. That motion is DENIED.  The fair trial claim will go to trial.

The Due Process Clause guarantees a criminal defendant's right to a fair trial. *Frost v. New York City Police Dep't*, 980 F.3d 231, 244 (2d Cir. 2020). That right is violated when a police officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Id.* (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). Plaintiffs injured by such violations may seek damages under 42 U.S.C. § 1983. *Id.*

A § 1983 plaintiff may assert a denial of fair trial claim based on a police officer's fabrication of evidence "when the information fabricated is the officer's own account of his or her observations of alleged criminal activity, which [the officer] then conveys to a prosecutor." *Barnes v. City of New York*, 68 F.4th 123, 129 (2d Cir. 2023) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 268, 274 (S.D.N.Y. 2016)). To prevail, a plaintiff must show that "an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Id.* at 128 (quoting *Garnett*, 838 F.3d at 279).

Unlike a malicious prosecution claim, a fair-trial claim based on fabricated evidence is not defeated by the existence of probable cause. *Ricciuti*, 124 F.3d at 130; *Frost*, 980 F.3d at 250. That is because the two claims vindicate different constitutional interests: fabricated evidence claims arise under the Fifth and Fourteenth Amendments, whereas malicious prosecution claims

arise principally under the Fourth Amendment. *Barnes*, 68 F.4th at 129 (citing *Smalls v. Collins*, 10 F.4th 117, 132–33 (2d Cir. 2021)). Thus, "No arrest, no matter how lawful or objectively reasonable, gives an arresting officer . . . license to deliberately manufacture false evidence against an arrestee." *Ricciuti*, 124 F.3d at 130.

Nor does such a claim require that there have been an actual trial. In *Frost*, the Second Circuit explained that, notwithstanding the claim's label, the fair-trial right protects against deprivations of liberty caused when an officer fabricates evidence and forwards it to prosecutors -- even if the fabricated evidence is never introduced at trial and even if no trial occurs at all. 980 F.3d 231, 248–51 (2d Cir. 2020). The constitutional injury inheres in the deprivation of liberty caused by the fabrication and transmission of false information, whether or not the evidence is presented to a jury. See *id.*; *Barnes v. City of New York*, 68 F.4th 123, 130 (2d Cir. 2023). Accordingly, "where plaintiff never proceeded to trial, the question is *if* the allegedly false information is material such that it would 'likely influence the jury if it arrived at a jury.'" *Case v. City of New York*, 408 F. Supp. 3d 313, 323 (S.D.N.Y. 2019) (emphasis in original) (citing *Garnett v. Undercover Officer C0039*, No. 13-CV-7083, 2015 WL 1539044, at *8 (S.D.N.Y. Apr. 6, 2015)).

A fair-trial claim is not categorically barred by a guilty plea. Under *Heck v. Humphrey*, a § 1983 fair trial claim is barred only where success would "necessarily imply the invalidity" of an extant conviction. 512 U.S. 477, 487 (1994). Where the fabricated evidence claim challenges charges or factual allegations that are distinct from those supporting the guilty plea, the claim can be heard. *See Poventud v. City of New York*, 750 F.3d 121, 137–38 (2d Cir. 2014); *Beckwith v. City of Syracuse*, 642 F. Supp. 3d 283, 291–92 (N.D.N.Y. 2022); *Wellner v. City of New York*,

34

393 F. Supp. 3d 388, 397 (S.D.N.Y. 2019); *Case v. City of New York*, 233 F. Supp. 3d 372, 388 n.10 (S.D.N.Y. 2017) (citing *Powers v. Coe*, 728 F.2d 97, 102 (2d Cir. 1984)).

Here, Plaintiff challenges the alleged fabrication of evidence related to the charges of attempted assault and resisting arrest. He pleaded guilty to neither of those charges. As a result, his success on this claim would not collaterally attack or otherwise undermine the validity of his guilty plea to disorderly conduct.

Liability for denial of a fair trial under § 1983 liability "attaches for knowingly falsifying evidence even where there *simultaneously* exists a lawful basis for the deprivation of liberty that the plaintiff suffered." *Barnes v. City of New York*, 68 F.4th 123, 130 (2d Cir. 2023) (citing *Smalls*, 10 F.4th at 132). Applied to Piatetsky's claim, this means that, even if the disorderly conduct charge for which Plaintiff pleaded guilty "provided a lawful basis for some of the deprivations he suffered, it would not sever the causal link between the fabricated evidence and those same deprivations, as well as others," that Piatetsky suffered as a result of the attempted assault and resisting arrest charges based on the allegedly fabricated evidence. *See id.*, at 131. In this case, Plaintiff would have gotten a DAT if all he had been charged with was disorderly conduct. It is the fact that he was charged with assault that catapulted him into D felony land and caused him to be held overnight.

Turning to Plaintiff's fair trial claim, four of the elements are not in dispute. Camacho qualifies as an "investigating official;" the allegedly fabricated information was likely to influence a jury and was plainly material to the charges of attempted assault, harassment, and resisting arrest; Camacho understood that his allegations would be included in the criminal complaint written by Lee and forwarded to prosecutors; and as a result of that allegedly fabricated information, Piatetsky was ineligible for a desk appearance ticket and was instead held

35

in custody overnight, constituting a deprivation of liberty. *See* Dkt. No. 42, at 11–12; Dkt. No. 37 ¶¶ 4, 29–32, 43–44, 49–50, 53.

The issue is whether Plaintiff has offered sufficient evidence that Camacho's allegations against Piatetsky were fabricated to get to a jury. He has.

Defendants argue that "Plaintiff cannot cite any evidence whatsoever supporting his claim that Defendants fabricated false evidence and forwarded it to either the New York County Criminal Court or the New York County District Attorney's Office." Dkt. No. 39 at 9. This is so, they argue, because Officer Lee prepared the criminal complaint based on "information he received from sworn PAPD officers on scene, as well as his own observations when responding to the incident." *Id.* That argument fails on its face, because Camacho gave Lee the information that Lee incorporated into the criminal complaint (and that the District Attorney then incorporated into the formal charges). Since Lee is entitled to rely on information given him by a fellow officer, he cannot be charged with falsification – the officer who gave him the information is the proper defendant. That officer is Camacho. See *Cook v. City of New York*, 243 F. Supp. 3d 332, 353 (E.D.N.Y. 2017).

Defendants argue that Lee prepared the arrest paperwork with Camacho's assistance, and that the paperwork also contained "information [Lee] received from sworn PAPD officers on scene, as well as, his own observations when responding to the incident." Dkt. No. 37 ¶ 53; Dkt. No. 39, at 9. Lee, however, did not witness the initial interaction or takedown; he arrived on the scene, "as soon as Camacho put [Piatetsky] on the floor." Nazareno Decl. Ex. Q at 20:40–21:30. To describe parts of the encounter that he did not observe, Lee relied on Camacho's allegations and his discussion with Lieutenant Mendez – who also relied on Camacho's allegations. Dkt. No. 37 ¶ 53; *see, e.g.,* Nazareno Decl. Ex. Q at 48:30–49:45. The ultimate source of all the factual

36

information contained in the criminal complaint was Camacho. The fact that Lee prepared that document (because he was designated as arresting officer) affords Camacho no defense whatsoever.

Piatetsky, for his part, argues that his claim that Camacho denied him the right to a fair trial is "well supported by the evidence." Dkt. No. 42, at 10–11. I agree that he has at least raised a genuine issue of material fact on that score.

As discussed above, the footage does not resolve the issue of whether Piatetsky "assaulted" Camacho by swatting away his hand. It is one man's word against another's. Ordinarily that would be enough to send us to trial. But Camacho argues that Piatetsky has not offered any evidence that he, Camacho, deliberately falsified evidence about the purported assault, as opposed to made a mistake about what happened.

A fair trial claim based on fabricated evidence requires a plaintiff to show that the defendant's use of inaccurate information was "knowing, as opposed to mistaken." *Barnes*, 68 F.4th at 129. Because "a mere difference in the testimony of the plaintiff and the officers about what occurred on the day of the arrest is not sufficient evidence to create a genuine dispute of material fact as to whether [the officers] intentionally falsified information or fabricated evidence," *Lauderdale v. City of New York*, 2018 WL 1413066, at *9 (S.D.N.Y. Mar. 19, 2018), a plaintiff must also put forth evidence of scienter. *See Davis-Guider v. City of Troy*, 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (summary order).

In this case there is at least some evidence that Camacho made up the story about being "assaulted" – which, because assault in the third degree is a D felony, is the charge that led to Piatetsky's being held overnight and sent to Central Booking, rather than being issued a DAT.

37

That evidence includes Camacho's indicating that he got the marks on his hand during the arrest (not from the swat); the fact that Camacho used his hand over the course of the afternoon without indicating that he had suffered any injury; and the extensive evidence suggesting that Camacho increased the severity of his purported "injury" over the court of the afternoon so that he could qualify for overtime by going to a hospital. This may not be the strongest evidence that Camacho was lying about the hand swat, but it is certainly enough to get Piatetsky a trial on the matter.

Moreover, Camacho made various comments at the scene from which a jury could conclude that he had an arguable motive to fabricate evidence about an assault -- namely to secure a more serious charge against Piatetsky and receive overtime pay for the additional work required to process the arrest and for Camacho to receive medical attention for an insignificant wound that may not have been caused by Plaintiff at all – and that did not impede Camacho's ability to work the arrest scene.[11] Camacho stated on BWC video that, in addition to a charge for criminal trespass, he intended to pursue an attempted assault charge based on his account that Piatetsky struck his hand, stating, "I'm going to talk to Lieutenant first to see if he can make it a '16,' too, for smacking my hand out of the way." Nazareno Decl. Ex. P at 13:34–14:15. Camacho's comment about "mak[ing] it a 16" refers to Camacho's attempt to secure Lieutenant Mendez's authorization for overtime – a 16-hour double shift – so that Camacho could file the additional paperwork required for a more serious charge against Piatetsky. Shortly after making the statement above, Camacho said to Reitan, twice, "Someone's going to have to take the 16 if I go to the hospital, right?" *Id.* at 13:34–14:17. Reitan responded in the affirmative, noting that he

---

[11] The practice of false arrests at the end of an officer's shift in order to obtain overtime is colloquially known as "collars for dollars." *See Cordero v. City of New York*, 282 F. Supp. 3d 549, 556 n.2 (E.D.N.Y. 2017) (Weinstein, J.). Specifically, the practice involves an officer attempting to "collar" himself into a full double shift by upgrading the charges – thereby necessitating more complex administrative processing – to maximize overtime pay. *Id.* at 555.

was "over 16 right now." *Id.* At the scene, Camacho repeatedly asks when the Lieutenant, or "8-0", will arrive so that Camacho can tell Mendez what happened. *See, e.g., id.* 15:00–15:10, 15:29–15:40.

That felony charges against Piatetsky would benefit Camacho financially was apparent to others on the scene. For example, after speaking with Mendez, Camacho returned to the ambulance to update the on-scene paramedics. *Id.* 27:30–28:05. Camacho indicated that Piatetsky would also be charged with attempted assault based on his account to Mendez, and the paramedic enthusiastically responded "Nice!" before quickly adding, "Your camera's not on, right?" *Id.*

The existence of such motivation is not a product of hindsight. Officer Lee contemporaneously expressed reservations about Camacho's effort to pursue more serious charges. Almost as soon as Camacho said he wanted to speak to the Lieutenant about approving the attempted assault charge, Lee asks him, "What are you doing?" *Id.* at 10:13–11:00. His concerns are eventually dispelled, however, when he and Sharkey are selected by Lieutenant Mendez to bring Piatetsky to the Bus Terminal for processing, prompting Lee to cover his BWC and ask Sharkey, "Can we get overtime for this?" Nazareno Decl. Ex. Q at 41:00 – 41:10.

Taken together the record suggests that Camacho may well have fabricated evidence about an assault. The issue goes to the jury.

Camacho and Piatetsky also offer conflicting accounts of whether Piatetsky resisted arrest or attempted to flee when he emerged from the Tunnel. *Compare* Nazareno Decl. Ex. I, at 5 ("The rider remained uncooperative and continuously attempted to flee the scene after interception."), *and* Nazareno Decl. Ex. J, at 6 ("Upon arrest, the perp *[sic]* resisted arrest."),

*with* Ex. P at 00:00–02:30, 3:50–4:10, 5:40–6:02 (footage from Camacho's body-worn camera).

Here the record strongly supports Plaintiff. The video footage is unclear, but it does not appear to show Piatetsky attempting to flee on foot, physically struggle against the officers, or attempt to "jump over the concrete barrier." Dkt. No. 37 ¶ 49. Plaintiff's conduct after he was taken down does not suggest that he was resisting arrest – he seemed confused but compliant. Plaintiff first asked Camacho whether he was under arrest. Nazareno Decl. Ex. P at 00:30–01:00. Piatetsky then offered to remove his wrist guards to allow Camacho to place him in handcuffs. Nazareno Decl. Ex. P at 00:30–01:00. He later offered to help officers remove his helmet and backpack. *Id.* at 3:58–6:02. Piatetsky disagreed with statements Camacho made to him, but he did so politely. *Id.* He did not swear at the officers, raise his voice, or even use a disrespectful or defiant tone. *Id.* He fully complied with all instructions, including by seating himself in the patrol vehicle as directed, and waited for the officers to inform him of the next steps and the specific charges to be filed against him. *Id.* at 9:37–49. At no point did Piatetsky attempt to flee on foot after being tackled by Camacho, and he certainly does not attempt do so "continuously." Finally, the other officers did not see any indicia of attempted flight.

So Piatetsky is at the very least entitled to a trial on the issue of whether Camacho made up the claim that he resisted arrest. Frankly, if anyone were entitled to summary judgment on this particular issue, it would be Plaintiff – not Camacho.

That Camacho's statements about the assault and resisting arrest were material to what happened to Piatetsky cannot be doubted. After hearing Camacho's version of events and speaking with Piatetsky following the arrest, Lee questioned whether Piatetsky should be charged at all. Nazareno Decl. Ex. Q at 10:07–10:30. Lee later remarked that he believed that Piatetsky could be charged with criminal trespass or obstructing governmental administration

40

("OGA") and explicitly stated that Piatetsky should receive, at most, a Desk Appearance Ticket (or "DAT"). *Id.* at 21:15–22:05. While transporting Piatetsky to the Bus Terminal holding cell, Lee reiterated his belief that Piatetsky would likely only be charged with criminal trespass and receive a DAT. *Id.* at 44:30–45:30, 48:30–55:30. Nevertheless, Lee included a litany of additional charges in Piatetsky's arrest paperwork only after speaking with Lieutenant Mendez – who knew only what Camacho had told him. *See id.*; Dkt. No. 37 ¶ 53.

Mendez, who was not present during the events at issue, authorized the charges against Piatetsky, including specifically the resisting arrest and assault charges, only after hearing Camacho's account of the encounter. *Id.* at 18:55–19:35; Nazareno Decl. Ex. P at 17:30–18:40, 23:00–27:25. Mendez did not speak to Piatetsky before concluding what had occurred, and he did not reconsider his conclusion when officers offered information contradicting Camacho's account. Nazareno Decl. Ex. Q at 18:55–19:35. For example, when Mendez asked officers if Piatetsky was compliant when they arrived, Reitan confirmed that Piatetsky was compliant after the arrest. *Id.* This could have been confirmed by reviewing Camacho or Lee's BWC footage, which shows Piatetsky cooperating with officers and offers no evidence of attempted flight. *See, e.g.*, Nazareno Decl. Ex. P at 5:44–6:02; Nazareno Decl. Ex. Q at 2:05–7:00. Piatetsky was nevertheless charged with resisting arrest. Nazareno Decl. Ex. I.

Despite what Defendant contends, Piatetsky does not "merely" offer inconsistencies between his testimony and Camacho's. He offers video evidence and statements from other officers that can be interpreted to contradict Camacho's testimony and support Plaintiff's version of events. *See* Dkt. No. 39, at 9. Some of that evidence is suggestive of falsification rather than mere mistake. It is significant that Camacho's BWC was not on during much of the relevant time

period, which means that we are deprived of the ability to see what was going on and hear what was being said.

In light of the above, the Court finds that Piatetsky has raised a genuine issue of material fact about whether Officer Camacho fabricated evidence by making false accusations against Piatetsky, knowing that his claims would be transmitted to prosecutors. Therefore, Plaintiff is entitled to a trial on Count 2, charging deprivation of his right to a fair trial based on the falsification of evidence.

Camacho is not entitled to qualified immunity on this particular claim. "Qualified immunity is unavailable on a claim for denial of the right to a fair trial where that claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find." *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015); *see also Jovanovic v. City of New York*, 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006) ("The right to a fair trial free of fabricated evidence is basic to our Constitution and was clearly established at the time that [the Defendant] allegedly acted. Any reasonable officer would have known that [p]laintiff's rights would be violated by ... making false statements to prosecutors." (citation omitted)).

Accordingly, Defendant's motion for summary judgment on the denial of fair trial claim is DENIED.

We will schedule a trial on the remaining claim against Officer Camacho for the fall of 2026.

### III.   *Monell*

The Port Authority moves for summary judgment dismissing Piatetsky's federal *Monell* claim and related state law claim for negligent hiring, training, and supervision. That motion is GRANTED.

A municipality may be liable under 42 U.S.C. § 1983 for constitutional violations committed by its employees if such violations result from an official policy or custom. *Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658, 692–94 (1978). The same principle applies with equal force to the Port Authority: A *Monell* claim lies where a plaintiff can establish that a constitutional injury resulted from a custom or practice of the Port Authority. *See Raysor v. Port Authority*, 768 F.2d 34, 39 (2d Cir. 1985).

To hold a municipality liable under § 1983, a plaintiff must plead and prove (1) an official policy or custom (2) caused (3) the deprivation of a constitutional right. *Holden v. Port Auth. of New York & New Jersey*, 521 F. Supp. 3d 415, 427 (S.D.N.Y. 2021). A policy or custom may be shown through, *inter alia*, a failure to train employees that amounts to deliberate indifference to constitutional rights. *Id.* "To prove such deliberate indifference, the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995).

Failure-to-train liability is available only in "limited circumstances," and deliberate indifference remains a "stringent standard of fault." *Hernandez v. United States*, 939 F.3d 191, 206–07 (2d Cir. 2019). A municipality is deliberately indifferent only where it had "actual or constructive notice" that a deficiency in its training program was likely to cause constitutional violations, generally through a "pattern of similar constitutional violations by untrained

employees," but failed to act. *Id.* (citing *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). It is therefore not enough for a plaintiff to argue, after the fact, that the incident might have been avoided with "better or more training." *Id.*

Nor is it enough to show that the particular officer misunderstood, forgot, or failed to follow his training; the relevant inquiry is the "adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 207. At summary judgment, the plaintiff must identify a specific deficiency in the training program and show that the deficiency is "closely related to the ultimate injury," such that it actually caused the constitutional deprivation. *Tarasov v. Port Auth. of N.Y. & N.J.*, 2026 WL 280464, at *13 (S.D.N.Y. Feb. 3, 2026) (citing *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006); quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)).

*Walker* supplies the familiar three-part formulation for deliberate indifference in the failure-to-train context. A plaintiff must show that a policymaker knew "to a moral certainty" that employees would confront the relevant situation; that the situation either presented employees with "a difficult choice of the sort that training or supervision will make less difficult" or reflected "a history of employees mishandling the situation"; and that "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992).

*Monell* does not expose municipalities to *respondeat superior* liability for "all misdeeds by municipal employees." *Id.* at 296; *see Connick*, 563 U.S. at 60–62. Rather, municipal liability attaches only when "the municipality itself commits the misdeed." *Walker*, 974 F.2d at 296 (citing *Monell*, 436 U.S. at 694). Thus, to establish *Monell* liability for inadequate training,

44

"plaintiffs must put forward some evidence that the City itself has acted or consciously not acted." *Id.*

In the failure-to-train context, municipal liability may arise where a municipality's failure to train its employees in a relevant respect amounts to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Hernandez*, 939 F.3d at 206–07. A plaintiff ordinarily demonstrates deliberate indifference for purposes of failure to train through a "pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. This is so because without notice that a course of training is deficient in a particular respect, municipal policymakers cannot be said to have "deliberately chosen a training program that will cause violations of constitutional rights." *Id.*

*Canton* demonstrates when such pattern evidence is not required: in the rare case where the need for training is so obvious that the unconstitutional consequences of failing to train are a "highly predictable consequence" of the omission, deliberate indifference may be inferred from a single constitutional violation. *Id.* at 63–64; *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 n.10 (1989). But even under an "obviousness" theory, "It is not enough to show that a situation will arise and that taking the wrong course in that situation will result in injuries to citizens"; the plaintiff must also show "a likelihood that the failure to train or supervise will result in the officer making the wrong decision." *Walker*, 974 F.2d at 299. Incidents that occur subsequent to the alleged violation, that are too few to establish a pattern, or that are insufficiently similar to the alleged constitutional violation do not establish the requisite notice. *See Greene v. City of New York*, 742 F. App'x 532, 536–37 (2d Cir. 2018).

With that framework in mind, the threshold issue is how to define the situation for which Plaintiff argues additional training was required. Piatetsky argues that the Port Authority "knew

45

to a moral certainty that its employees would be confronted with the situation of how to stop moving vehicles at the Tunnel," because Camacho "had stopped other EUCs at the Tunnel and had been involved in other collisions at the Tunnel." Dkt. No. 42, at 14–15. But that framing defines the relevant situation too broadly. The force at issue was not used to prevent Piatetsky from entering the Tunnel; it was used after he had entered the Tunnel, turned around, exited against traffic, and (as shown on the video) changed lanes so that it appeared that he might be trying to ride away from Officer Camacho. Thus, the relevant question is whether the Port Authority knew to a moral certainty that PAPD officers would repeatedly confront that kind of situation, rendering the need for specific use-of-force training was "obvious." *City of Canton*, 489 U.S. at 390 n.10. Without such notice, the failure to provide more specific training for that situation cannot amount to deliberate indifference.

The evidence concerning Camacho's job duties does not bridge that gap. The record shows that his responsibilities included monitoring traffic and preventing prohibited vehicles from entering the Holland Tunnel. Dkt. No. 37 ¶ 16. That evidence establishes that officers would "obviously" encounter prohibited vehicles at or near the Tunnel entrance. It does not, however, establish that PAPD had notice of a need to train officers on how to respond when riders enter the Tunnel on prohibited vehicles, traffic is stopped, and officers need to physically apprehend those riders who attempt to avoid the bottleneck by driving against traffic to exit using a Tunnel entrance of by swerving away from an officer in a manner that suggested he was trying to escape.

Nor does Plaintiff offer other evidence to support the conclusion that the specific situation confronting Camacho occurred with any frequency. Plaintiff identifies his own experience, prior instances where Camacho encountered electric scooter riders seeking entry into

46

the Tunnel, and one instance when Camacho collided with an unregistered motorcycle as it entered the Tunnel. Dkt. No. 42, at 14–15; Warner Decl. Ex. 2, Camacho Tr. at 63:25–65:9, 125:7–19. The record also includes BWC footage showing a rider approaching the Tunnel on an electric unicycle, another approaching on an e-bike, and three pedestrians attempting to enter the Tunnel. Nazareno Decl. Ex. Q at 10:25–10:55, 22:03–22:49, 38:00–40:10. Those incidents highlight PAPD's awareness that officers might encounter persons riding vehicles illegally into tunnels or other forbidden roadways, but apparently there are protocols for dealing with such situations.

Here, however, the officer was confronted with someone who had committed at least one crime (I count at least three – trespass into the tunnel in violation of the Traffic Rules, riding the wrong way on a one way street, and the possible fare beat when Piatetsky turned around and re-entered New York without paying a toll) in circumstances that reasonably could have appeared to indicate an attempt to avoid an encounter with law enforcement officers. The precise facts of our situation may be unique – so unique that Plaintiff has not shown that this specific situation was recurrent. But that is not really the issue. In this case Camacho had probable cause to believe that someone he was trying to arrest had committed a crime and knew that this person was traveling on a moving vehicle that was moving away from him. PAPD officers are trained to use force if necessary to effectuate an arrest when they have probable cause to believe that a crime has been committed. That is precisely what Camacho did. Whether less force, or no force at all, would have gotten Piatetsky off his cycle and into handcuffs is not the issue for Monell purposes. The issue is whether the PAPD trains its officers that they are authorized to use reasonable force when they have probable cause to believe that someone has committed a crime.

47

All the evidence is to the effect that the PAPD provides such training. That is all the municipality is required to do. It is not an insurer that every application of force will end happily.

The record evidence concerning PAPD training confirms that Plaintiff has not identified a specific deficiency closely related to the injury alleged here. Port Authority argues that Camacho's actions were "consistent with the training he received from the PAPD," Dkt. No. 39, at 11. PAPD points to Camacho's testimony that he received bi-annual training on the reasonable use of force, as well as on-the-job training specific to the use of force by officers assigned to the Holland Tunnel. Nazareno Decl. Ex. A, Camacho Tr. at 109:11–110:8, 111:5–16, 123:4–125:23; Dkt. No. 44, at 6. Port Authority further represents that PAPD training includes instruction on how to stop people in moving vehicles, including bicycles and similar devices. *Id.* There is no evidence that Camacho did not receive the training he was required to take. Plaintiff disputes the sufficiency of that training, but he does not identify evidence of a particular omitted instruction, recurring training gap, or prior similar incident that would have put the Port Authority on notice that its existing training was likely to cause officers to use unconstitutional force against individuals whom they had probable cause to believe had committed a crime in circumstances where they needed to stop that individual in order to effectuate an arrest. *See Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129–30 (2d Cir. 2004); *Connick,* 563 U.S. at 62; *Walker,* 974 F.2d at 297–99. Without such evidence, municipal liability cannot attach under *Monell.*

Nor can Piatetsky raise a genuine issue of fact on his *Monell* claim by arguing that, whatever training he may have received, Camacho was a poor student. *See Hernandez,* 939 F.3d at 207. At his deposition, Camacho testified that he was trained in the principle that PAPD officers are permitted to use reasonable force to stop someone for whom there is probable cause to suspect has committed a crime. Nazareno Decl. Ex. A, Camacho Tr. at 123:12–15. And here

there was indeed probable cause to believe that Piatetsky had committed a crime – actually, multiple traffic violations, including the possible fare beat. Significantly, Piatetsky does not contend that there was no probable cause to arrest him; he has not asserted a false arrest claim and has not argued that there was no probable cause to support his arrest.

Nor does Camacho's inability to recall the precise PAPD protocol for stopping a prohibited vehicle from entering the Tunnel, or to describe every circumstance in which force is permissible in that context, establish that PAPD failed to give him appropriate training. *Id.*, Camacho Tr. at 123:2–125:23. To the contrary, the evidence shows that he did receive such training. Moreover, that was not the context of the situation he encountered.

Finally, the fact that Camacho had previously failed to stop, and ultimately collided with, an unregistered motorcycle that was entering the Tunnel illegally is not evidence of any deficiency in training by the PAPD. *Id.*, Camacho Tr. at 125:7–15. The facts of that incident are not recounted in the record and there is no way to know whether anything that happened during that incident reflected on the training that PAPD officers admittedly receive.

Plaintiff's reliance on *Fox v. Triborough Bridge & Tunnel Authority*, 462 F. Supp. 3d 241 (E.D.N.Y. 2020), does not alter that conclusion. *Fox* illustrates the kind of record that can support failure-to-train liability. There, the evidence showed that the defendant officer's assigned duties directly included the recurring enforcement situation at issue: monitoring bicyclists on the Marine Parkway Bridge, ensuring that they dismounted on the pedestrian walkway, and issuing warnings or summonses if they continued riding. *Id.* at 247. The evidence also showed recurrence: the officer testified that "dozens" of bicyclists rode across the bridge that day, and that earlier the same day two bicyclists had ignored an order to stop riding. *Id.* Critically, the officer himself testified that he had not been trained how to stop a bicyclist riding downhill by

49

standing in the walkway and ordering him to stop, and that specific training would have "assist[ed]" him, "helped," and allowed him to make "a better decision." *Id.* at 247–48. On that record, the court held that a reasonable jury could find the need for training "obvious." *Id.* at 248.

This record lacks comparable evidence. Although Camacho's duties included monitoring traffic and preventing prohibited vehicles from entering the Holland Tunnel, unlike the *Fox* plaintiff, Piatetsky has not identified evidence that PAPD officers repeatedly confronted the specific situation he faced here. Nor has Plaintiff identified testimony, training materials, prior incidents, or other record evidence comparable to the proof in *Fox* showing that PAPD officers lacked training for a specific recurring situation and that the absence of such training made unconstitutional force likely. *See Amnesty Am.*, 361 F.3d at 129–30; *Walker*, 974 F.2d at 297–99. *Fox* therefore underscores the defect in Plaintiff's *Monell* claim: the record may show that PAPD officers occasionally encounter prohibited vehicles at or near the Tunnel, but it does not show that the Port Authority was on notice of a recurring, specific use-of-force situation requiring additional training that involved an illegal exit from the Tunnel in circumstances like the most unusual ones in this case.

Accordingly, Defendant Port Authority is entitled to summary judgment on Plaintiff's *Monell* claim.

### IV.    New York Negligent Hiring, Retention, and Supervision

The Port Authority argues that Piatetsky's negligent hiring, retention, and supervision claim fails because "Plaintiff has failed to allege any facts that show individual Defendant (Officer Camacho);s *[sic]* prior conduct would have made the Port Authority aware that they

were *[sic]* not suitable employees *[sic]*." Dkt. No. 39, at 12 (Defendants' motion for summary judgment).

Under New York law, a plaintiff can state a claim for negligent hiring, training, and supervision by showing, "in addition to the standard elements of negligence,"

> (1) that the tortfeasor and the defendant were in an employee-employer relationship [. . .]; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to [its] occurrence [. . .]; and (3) that the tort was committed on the employer's premises or with the employer's chattels.

*Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). "A cause of action for negligent hiring or retention requires allegations that the employer [. . .] failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." *Bouchard v. N.Y. Archdiocese*, 719 F.Supp.2d 255, 261 (S.D.N.Y. 2010).

Here, Piatetsky's negligent hiring and retention theory fails because he offers no evidence that the Port Authority was on notice of Officer Camacho's alleged propensity to use excessive force. *Bouchard*, 719 F.Supp.2d at 261. Plaintiff identifies no prior incidents or complaints against Camacho that would have put Port Authority on notice of Camacho's supposed propensity, instead relying on the evidence offered in support of his *Monell* claim.

Relatedly, Piatetsky's negligent training and supervision theory also fails because the record does not support finding that the Port Authority knew or should have known of a foreseeable risk of the type of harm at issue here. Specifically, Piatetsky has not shown that his

having been subjected to potentially excessive force for riding a prohibited vehicle into the Tunnel and then back out again was the reasonably foreseeable consequence of the absence of a particular training. Plaintiff attempts to frame the relevant risk at a high level of generality – namely, officers' interactions with individuals riding moving vehicles – but the proper inquiry is whether the Port Authority was on notice that its training was deficient in a manner likely to result in the use of unreasonable force in the specific circumstances presented.

The record contains no such evidence. Although the Traffic Rules do not clearly mention electric unicycles or scooters, they apply to all unregistered vehicles. Furthermore, any ambiguity in the 2016 Rules does not give rise to a foreseeable risk that officers would respond to a violation with excessive force, and Plaintiff identifies no prior incidents, complaints, or statistical patterns suggesting otherwise. *Bouchard v. N.Y. Archdiocese*, 719 F.Supp.2d 255, 261 (S.D.N.Y. 2010). Nor does Officer Camacho's testimony establish a triable issue of fact, as it reflects, at most, an individual misunderstanding of the meaning of "force" rather than a systemic deficiency in training. In the absence of evidence that the Port Authority was on notice of a recurring or predictable risk of similar conduct, no reasonable jury could find that it failed to exercise reasonable care in training its officers.

Port Authority is thus entitled to summary judgment on Plaintiff's state law negligent hiring, retention, training and supervision claim.

### Conclusion

For the foregoing reasons, Defendants' motion for summary judgment dismissing the excessive force and fair trial claims is DENIED, and the branch of Defendants' motion

dismissing the *Monell* and state law negligent hiring, retention, training and supervision claims is

GRANTED.

The Clerk of Court is directed to remove the motion at Docket # 36 from the court's list

of open motions.

This is a written opinion resolving a summary judgment motion.

Dated: May 19, 2026

_____

U.S.D.J.

BY ECF TO ALL COUNSEL